**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Stephanie Palmer, individually and on behalf of all others similarly situated, | 1:22-cv-05036 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| The Procter & Gamble Company, | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.　　The Procter & Gamble Company ("Defendant") manufactures, markets, and sells women's hygiene products represented as "Pure Cotton*"under the Tampax brand ("Product").



2.     Other statements include "Tampons Free of Dyes, Fragrances & Chlorine Bleaching," "*Contains 100% Organic Cotton Core," a picture of cotton, and "90% Plant Based Applicator."

## I.     PURE COTTON

3.     Consumers understand "pure" consistent with its dictionary definitions as "not altered from an original or natural state," "not mixed with anything else" and "clean and not harmful in any way."

4.     Consumers value personal care products labeled as "pure" because non-pure ingredients are associated with detrimental health and environmental effects.

5.     Sales of personal care products based on pure components are growing twice the rate of traditional personal care products.

6.     According to Nielsen, whether personal care products contain components in their pure state is of high importance to half the public.

7.     Academic studies indicate that consumers will pay at least ten percent more for personal care products with claims that state or imply the use of components which have not significantly altered from their original state.

8.     By describing the Product as "Pure Cotton*," consumers will expect all of its components to be made from cotton

9.     Despite the front label promise the Product was "Pure Cotton," the non-core ingredients are not pure because they are significantly altered from their original or natural state.



INGREDIENTS/INGREDIENTES: Cotton, Polypropylene, Polyester/Poliéster, Glycerin, Paraffin, Titanium Dioxide

**INGREDIENTS:** COTTON, POLYPROPYLENE, POLYESTER, GLYCERIN, PARAFFIN, TITANIUM DIOXIDE

10.     Polypropylene is a synthetic resin built up by the polymerization of propylene.

11.     Polyester is a synthetic fiber made from petroleum. Polyester is not a "pure" ingredient because it is created through a chemical reaction between ethylene glycol and more terephthalic acid.

12.     While glycerin can be sourced from vegetable oils, its extensive use by the personal care industry means it must be obtained as a byproduct in biodiesel production.

13.     This is done through hydrogenolysis, a chemical reaction in which a carbon-carbon or carbon-heteroatom single bond is cleaved or undergoes lysis by hydrogen.

14.     Paraffin is a solid mixture of hydrocarbons obtained from petroleum characterized by relatively large crystals.

15.     Titanium dioxide is a mineral from mined ilmenite ore.

16.     Converting this to a pigment involves chemical reactions and significant heat, either through a sulfate process with concentrated sulphuric acid or a chloride process using chlorine gas.

17.     Both methods involve chemical reactions and significant heat, but the chloride process is more widely used.

18.     This entails mixing raw materials with gaseous chlorine at roughly $1000°C$ in a fluidized bed reactor in the presence of coke as a reducing agent.

19.     The result is a gas stream of titanium tetrachloride, which after hydrolysis, produces titanium dioxide pigment.

20.     The non-cotton ingredients are not pure, and according to the European Union, titanium dioxide is potentially harmful to consumers.

21.     Only a small asterisk next to "cotton" refers to a smaller statement indicating the entire Product is not "pure," only that it "Contains [a] 100% Organic Cotton Core."

## II.     MISLEADING STATEMENT ABOUT COLORING

22.     The statement, "Tampons Free of Dyes, [] & Chlorine Bleaching" appeals to the majority of purchasers who seek personal care products without added coloring.

23.     Though it may be literally true that the Product is "Free of Dyes, [] & Chlorine Bleaching," this statement is misleading because it contains titanium dioxide, a synthetically prepared powder used as a white pigment.

24.     The use of titanium dioxide serves the identical purpose of dye and chlorine bleaching with respect to the Product's components such as the string.

## III.    PLANT-BASED APPLICATOR

25.     Recent years have seen increased attention at the environmental harm caused by single-use plastics.

26.     This includes the fossil fuels used to produce them, disposal in oceans and disruption to marine life, and release of chemicals they contain.

27.     Consumer awareness of these issues drives them towards attempting to reduce their use of plastic.

28.     According to British organization Natracare, female consumers "see the words 'plant-based' on [a] box and they think that they are choosing an ecological alternative to oil-based plastic tampon applicators."[1]

29.     This was confirmed by survey results showing almost 80 percent of consumers thought "plant-based plastic" meant a compostable and biodegradable alternative to plastic.

_____

[1] Applicators Unwrapped: The Truth About "Plant-Based" Plastic Tampon Applicators.

30.     Only 11 percent of respondents correctly knew that plant-based plastic is no different from regular plastic.

31.     According to Natracare, "'plant-based' refers to the source of the material itself, not how the resulting plastic will behave after it's been thrown away."

32.     Plant-based applicators contain identical chemical residues, regardless of their source.

33.     While plant-based plastic may be created from agricultural scraps, such as sugarcane, corn, wheat or food waste, the resulting polypropylene (or polyethylene), "persists in the environment in just the same way [as regular plastic]."

34.     This means it will behave identically to oil-based polypropylene, and "will never biodegrade. Instead, it will break down into microplastic particles over hundreds of years."

35.     According to laboratory testing conducted by Dr. David Santillo of Greenpeace, the tampon applicators marketed as made from plant-based plastic "were still the same old plastic."

36.     Dr. Santillo stated that these applicators "will likely persist in the natural environment in exactly the same way as 'conventional' plastic applicators."

37.     Dr. Santillo lamented how companies are selling plant-based applicators to consumers "as a positive environmental choice [which] is misleading."

38.     Compostable and biodegradable plastics exist and are commercially and technically feasible.

## IV.   CONCLUSION

39.     Defendant makes other representations and omissions which are false and misleading.

40.     Defendant sold more of the Product and at higher prices than it would have in the

absence of this misconduct, resulting in additional profits at the expense of consumers.

41.    As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $11.49 for 24 tampons, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

42.    Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

43.    The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

44.    Plaintiff is a citizen of Illinois.

45.    Defendant is an Ohio corporation with a principal place of business in Cincinnati, Ohio, Hamilton County.

46.    The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

47.    The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold at thousands of locations and online in the States covered by the classes Plaintiff seeks to represent with these representations for several years.

48.    The Product is available to consumers from third-parties, including grocery stores, dollar stores, warehouse club stores, drug stores, big box stores, and online.

49.    Venue is in this District because Plaintiff resides in this District and the actions giving rise to these claims occurred within this District.

50.    Venue is in this District, with assignment to the Eastern Division, because a

substantial part of the events or omissions giving rise to these claims occurred in Cook County, including Plaintiff's purchase, transactions and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

51.   Plaintiff Stephanie Palmer is a citizen of Lombard, DuPage County, Illinois.

52.   Defendant The Procter & Gamble Company is an Ohio corporation with a principal place of business in Cincinnati, Ohio, Hamilton County.

53.   Defendant operates the Tampax brand of women's personal care products.

54.   Plaintiff seeks to purchase personal care products which (1) contain pure components, which she understands to refer to substances which have not been significantly altered from their initial state, and have no possibility of harm, (2) lack added coloring, and (3) are better for the environment than alternatives.

55.   Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Dollar General, 221 W Roosevelt Rd Lombard IL 60148, between 2020 and 2022, and/or among other times.

56.   Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

57.   Plaintiff bought the Product at or exceeding the above-referenced price.

58.   Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes and/or components.

59.     Plaintiff paid more for the Product than she would have paid absent the false and misleading statements and omissions.

60.     Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance its representations are consistent with its abilities, attributes, and/or composition.

61.     Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar women's personal care products represented as pure, without added coloring, and plant-based, because she is unsure whether those representations are truthful.

<u>Class Allegations</u>

62.     Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Utah, West Virginia, Wyoming, Arkansas, Ohio, Nevada, South Carolina, and Mississippi who purchased the Product during the statutes of limitations for each cause of action alleged.

63.     Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

64.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

65.     Plaintiff is an adequate representative because her interests do not conflict with other members.

66.     No individual inquiry is necessary since the focus is only on Defendant's practices

and the class is definable and ascertainable.

67.     Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

68.     Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

69.     Plaintiff seeks class-wide injunctive relief because the practices continue.

### Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*

70.     Plaintiff incorporates by reference all preceding paragraphs.

71.     Plaintiff read and relied on the labeling indicated above and believed the Product was pure, without added coloring, and was better for the environment because it was made with plant-based plastics.

### Violation of State Consumer Fraud Acts (Consumer Fraud Multi-State Class)

72.     The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

73.     The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

74.     Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

75.     The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it was pure, without added coloring, and was better for the environment because it was made with plant-based plastics.

76.     Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

77.     Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

78.     Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it was pure, without added coloring, and was better for the environment because it was made with plant-based plastics.

79.     Defendant's representations affirmed and promised the Product was pure, without added coloring, and better for the environment because it was made with plant-based plastics.

80.     Defendant described the Product so Plaintiff believed it was pure, without added coloring, and better for the environment because it was made with plant-based plastics, which became part of the basis of the bargain that it would conform to its affirmations and promises.

81.     Defendant had a duty to disclose and/or provide non-deceptive descriptions of the Product.

82.     This duty is based on Defendant's outsized role in the market for this type of Product, custodian of the Tampax brand.

83.     Plaintiff recently became aware of Defendant's breach of the Product's warranties.

10

84.   Plaintiff provides or will provide notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's express and implied warranties.

85.   Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

86.   The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

87.   The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it  was marketed as if it was pure, without added coloring, and better for the environment because it was made with plant-based plastics.

88.   The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it was pure, without added coloring, and better for the environment because it was made with plant-based plastics.

Negligent Misrepresentation

89.   Defendant had a duty to truthfully represent the Product, which it breached.

90.   This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, the industry leader in women's personal care products.

91.   The representations and omissions went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality,

transparency and putting customers first that it has been known for.

92.     These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

93.     The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

94.     Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, her purchase of the Product.

Fraud

95.     Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was pure, without added coloring, and better for the environment because it was made with plant-based plastics.

96.     The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of this falsity and deception, through statements and omissions.

Unjust Enrichment

97.     Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2.  Injunctive relief to remove, correct and/or refrain from the challenged practices and

representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

3.  Awarding monetary damages, statutory and/or punitive damages and interest;

4.  Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5.  Other and further relief as the Court deems just and proper.

Dated:    September 15, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com